UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MIGUEL CRAIG, | ) | 1:07-CV-0951 AWI JMD HC |
| | ) | |
| Petitioner, | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| v. | ) | REGARDING PETITION FOR WRIT OF |
| | ) | HABEAS CORPUS |
| | ) | |
| D.K. SISTO, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Stanislaus County Superior Court. A jury convicted him in Case No. 1037511 of assault with a deadly weapon with personal infliction of great bodily injury. In Case No. 1048160, Petitioner pled no contest to petty theft with a prior theft. In both cases, it was found that Petitioner had suffered a prior serious felony conviction. The trial court sentenced him to fifteen years and four months in state prison. (Answer at 1-2.)

Petitioner filed an appeal in the California Court of Appeal. The court affirmed the judgment in a reasoned opinion. (Answer at 2; Lodged Docs. 1-2.)

Petitioner filed a petition for review in the California Supreme Court. The court summarily

1  denied review.  (Answer at 2; Lodged Docs. 3-4.)

2      Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  The

3  court summarily denied the petition.  (Answer at 2; Lodged Docs. 5-6.)

4      On June 22, 2007, Petitioner filed the instant petition in this Court.  The petition raises the

5  following six grounds for relief: 1) insufficient evidence to support finding that Petitioner had

6  suffered a prior serious felony conviction; 2) trial court erred in denying Petitioner's motion to

7  suppress his statements to detectives; 3) ineffective assistance of trial counsel; 4) insufficient

8  evidence to support conviction for assault; 5) insufficient evidence to show Petitioner's prior

9  conviction was a strike; and 6) ineffective assistance of appellate counsel.

10     On September 27, 2007, Respondent filed an answer to the petition.

11     On January 2, 2008, Petitioner filed a traverse to the answer.

12                         **FACTUAL BACKGROUND[1]**

13 *Case No. 1037511*

14     <u>The Prosecution Case</u>

15     On February 5, 2002, Waymon Myles (Myles) and Petitioner drove in the latter's gray Saturn

16 automobile to a Beacon Gas Station at H and Seventh Streets in Modesto.  Myles and Petitioner had

17 gotten "high" on crack cocaine during the preceding 36 hours.  Myles had been released from prison

18 some 30 days earlier.  He claimed he had been "clean" from drugs for 13 months and that drugs did

19 not affect his mental state on February 5.

20     The two men needed money so they agreed to take a homeless couple, one "Suzie" and her

21 boyfriend, to Crows Landing, where Suzie intended to buy a used car.  Myles and Petitioner believed

22 the couple had money and would pay for the ride.  The two men wanted to use the payment to buy

23 more drugs.  Petitioner and Myles met the couple around noon and together they drove to the gas

24 station.  When they arrived, the couple gave Petitioner $10 for fuel.  Petitioner bought only $5 of

25 gasoline and a discussion ensued as to the disposition of the remaining money.

26     During the discussion, both Petitioner and Myles mentioned they were going to buy drugs

27

28       [1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of August 4, 2005 and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. 2.

and planned on doing so first since the dealer was located on the way to Crows Landing. At that point, Suzie's boyfriend became upset, said he wanted nothing to do with the purchase of drugs, and got out of the car. Suzie followed her boyfriend out of the vehicle.

Petitioner became upset with Myles because the couple had left. He told Myles, "You just fucked us out of all the money. Get out." In turn, Myles angrily told Petitioner to "fuck himself" and left the car. Myles walked around the front of the car and sat on a railing next to the gas pumps at the station. As Myles did so, Petitioner revved the car's engine, put the vehicle in drive, circled the pumps, and aimed the Saturn directly at Myles.

When Myles saw the car approaching him, he reached into a nearby garbage can and threw an object at the windshield or hood. Myles made eye contact with Petitioner and the latter had an "angry" appearance. The car was upon Myles just as soon as he threw the object from the garbage can. To avoid the car, Myles reached for a gas pump to pull himself onto the concrete island. However, his left foot was off the concrete curbing and the car struck him, pinning his foot between the concrete and the front of the car. Myles looked at his disfigured foot and went into shock while Petitioner drove away in the Saturn.

Myles laid at the gas station for 37 minutes and lost four and a half pints of blood before being taken to the hospital. The Saturn almost completely amputated his left foot, which hung by three ligaments. Myles was hospitalized for the next five months, underwent three separate amputations of his left leg, and was ultimately fitted with a prosthesis approximately six inches below his left knee.

Modesto Police Officer Myrle Morse was called to the Beacon gas station on February 5, 2002. Upon arrival, he saw Myles laying on his back and fire and emergency personnel assisting him. Morse said Myles's foot looked as though it were 90 percent severed. Morse saw in the vicinity a piece of metal that resembled a car bumper and he took it into evidence. He also observed damage to the metal pole located next to Myles. The damage to the gas pump was consistent with damage Morse later saw in a photograph of Petitioner's Saturn.

Delores Saldivar (Saldivar), the cashier at the Beacon gas station, testified she first saw someone pumping gas and then heard a car speeding or "gunning" its engine. She had been talking

1  to a beer delivery person when she first heard these noises.  When Saldivar turned to look at the
2  islands, she saw a car making a turn around the gas pumps.  The car went around the pumps closest
3  to the store building and returned toward the pumps closest to Seventh Street.
4        Saldivar also saw a man walk away from the Seventh Street pumps, then turn back, walk to a
5  nearby garbage can, and pick something out of the receptacle.  Saldivar told the delivery person she
6  believed the man was going to throw something at the car.  The man then threw something that
7  looked like paper at the moving vehicle.  Moments later the car hit the man with a thump and
8  Saldivar covered her face.  The car screeched away from the gas station.  Saldivar then heard the
9  victim's screams through the closed door to the cashier's area of the store.
10        Modesto Police Detective Philip Owen investigated the February 5, 2002, incident.  Myles
11  told Detective Owen he and Petitioner had been staying at the Budget Inn.  Owen went there and
12  obtained Petitioner's first name.  A police department records check revealed that Petitioner was a
13  possible suspect in the incident.  Owen located Petitioner in Stockton on February 21, 2002.
14  Petitioner was driving a gray Saturn with damage on the right side of the body.  The damage was
15  consistent with the damage at the Beacon gas station, including paint similar to chips recovered at
16  the scene.  Although the vehicle was registered to one Lynn Harper, a checkbook in the car bore the
17  name Amy Poechhacker.  Owen eventually contacted one Michelle Saint James, who was
18  Petitioner's girlfriend.
19        Joy Smith, a Modesto Police Department identification technician, took a sample of
20  Petitioner's fingerprints during trial and compared them to records reflecting his prior felony
21  convictions.  Smith testified both sets of prints were made by the same individual.
22        <u>Defense</u>
23        Petitioner testified he first met Myles in 1989 and saw him on and off in jail, prison, or the
24  parole office in the ensuing years.  The day before the incident, Petitioner met a woman who had a
25  key to a room at the Budget Inn.  The woman was a friend of Myles.  Myles was already in the motel
26  room when Petitioner arrived and the two men went out in the gray Saturn to take a drive and get
27  high.
28        The pair drove to the home of Petitioner's surrogate uncle, Tony.  Tony asked Petitioner to

pick up a couple at Sunshine Place the following day. Petitioner and Myles drove with Tony to Sunshine Place and met the two people, who arrived by bicycle. Petitioner and Myles made arrangements with the couple to transport them to a car lot and help them purchase a used vehicle. The couple did not arrive at the scheduled time on the appointed day. Petitioner and Myles drove to the same spot the next morning to see if they could locate the couple.

Petitioner and Myles eventually located the couple, who agreed to accompany them to the gas station. Petitioner cautioned Myles not to mention drugs to the couple because they were friends of his Uncle Tony. When the couple gave Petitioner $10, he went into the Beacon store and purchased gas, an orange soda, and a Sno-Ball cake. Petitioner returned to the Saturn and noticed an argument was underway. The man got out of the car, told Petitioner to keep the $10, and said he and Suzie were leaving. When Petitioner asked what was going on, the man said Myles had asked the couple for money to buy drugs. The man was upset because he was trying "to stay clean."

Petitioner told the man he did not have to buy drugs for them but the couple left anyway. Myles looked out of the car window and said to Petitioner, "that's okay." When the couple departed, Myles asked Petitioner if he had spent the money. Petitioner told him he had spent it all on gasoline. Myles responded, "What'd you do that for? I could have got a little something."

Petitioner told Myles he was not going to buy drugs and instead was going to go home. He asked Myles where he would like to be dropped off. Myles said, "I don't want you to drop me off nowhere. I'm going to get off your damn car." Myles alighted from the car, slammed the door, and began walking toward Seventh Street. Petitioner described Myles's conduct as "throwing a little fit."

Petitioner sipped his soda, took a bite of his snack cake, and started the car. He claimed he was not used to a manual transmission, so the engine of the car revved a little and the tires squealed when he turned on the ignition. Petitioner adjusted the radio and noticed that Myles was walking away. Petitioner turned the car around in the gas station because he intended to find the couple and at least offer them a ride to their destination. As he turned the corner in the gas station, Petitioner went up and down on the curbing. He thought he had hit a stationary barrier or a garbage can. Petitioner said he panicked a little and left the scene. Petitioner claimed he never saw Myles during any of this. At one point, however, the windshield became blurry and it cracked before the car hit

anything.

Petitioner later examined the front end of the car and saw damage consistent with having hit the stationary garbage can. Petitioner saw no blood on the front end of the vehicle. Petitioner denied being angry with Myles or ever intending to do anything to hurt him. He said he never would have left Myles in the gas station had he known of his injuries. Petitioner said Myles was like a brother to him and Petitioner denied hearing Myles's screams.

On cross-examination, Petitioner testified he never knew Myles was in the hospital so he never checked on him after the incident. Petitioner claimed the two men had no common friends. Petitioner said the Saturn belonged to his girlfriend, Michelle Saint James, but was registered to her former sister-in-law, Lynn Harper. Petitioner said he had dated Saint James for two years and had used her vehicle during that time.

Petitioner admitted a prior conviction for section 245, assault with a pair of scissors. He also admitted violating parole in 1998 and going back to prison as a result. Petitioner said he again violated parole in 2000 and returned to prison as a result of that violation.

Rebuttal

Detective Owen testified he arrested Petitioner as he was walking down a street in Stockton. When Owen asked Petitioner if he was Miguel Craig, Petitioner claimed he was "Duran Craig." Owen, along with Modesto Detective Brocchini, then handcuffed Petitioner, placed him in the car, and transported him to the house where the Saturn was located. Neither Owen nor Brocchini had ever met Petitioner before. However, other members of the Craig family had filed complaints against the two detectives.

Owen gave Petitioner his *Miranda* admonitions and Petitioner appeared to be under the influence of a stimulant. Petitioner later admitted to Owen that he had been driving the Saturn at the time of the "incident." However, Petitioner claimed that he and Myles engaged in an argument over the couple's money. According to Petitioner, Myles got out of the car after the argument and "wrenched" the car door starting to pull it off of its hinges in the process. Petitioner became afraid because of Myles's large frame. Petitioner admitted swerving into Myles with the car but did not know he actually hit Myles. Petitioner told Detective Owen he never would have left the gas station

1  if he had known Myles was injured.  Petitioner also maintained Myles threw a cup of coffee onto the
2  windshield of the Saturn and that it obscured his vision.
3       Owen observed no cracks in the windshield of the Saturn.  When the interview concluded, a
4  tow truck arrived to remove the Saturn and Petitioner departed with Owen.  Owen testified that
5  Myles denied pulling on the door of the Saturn.  Owen concluded Petitioner would have been able to
6  hear Myles's screams after he had been struck by the vehicle.
7       Richard Aanerud, a Miller Beer delivery person, was talking with Saldivar when the incident
8  occurred.  Aanerud was inside the store when he heard tires squealing and he turned to see a car
9  "peeling out" around a pump.  On cross-examination, Aanerud indicated the car was not "burning
10 rubber" and that the screeching tires could have been caused by slick pavement.  He estimated the
11 car was traveling at four or five miles per hour at the time of the collision.
12      Aanerud said the station had two pump islands and the Saturn was located between them.
13 The Saturn turned right in front of the store and came back toward Seventh Street.  Myles was at the
14 end of the island about three or four feet from a garbage can.  Myles threw an object at the car.
15 Aanerud said the object appeared to be a "bag."  However, the object had no weight behind it and
16 made no sound upon impact.
17      The car rounded the corner of the pump island and ran up onto Myles, who was partially on
18 and partially off the island.  Aanerud said he observed no loss of control of the vehicle and saw no
19 damage to the car.  Once the car struck Myles, it kept going.  Aanerud heard Myles's screams inside
20 the store, even though the doors to the store were closed.  Aanerud did not see any liquid come out of
21 the object that Myles threw at the car and did not see Myles grab the door of the Saturn.
22      <u>Surrebuttal</u>
23      Petitioner testified he first learned of Myles's injuries when Owen arrested him.  Petitioner
24 said he was intimidated by Detectives Owen and Brocchini at the time of arrest because both men
25 had a "personal vendetta" against the Craig family.  He claimed Owen had once handcuffed
26 Petitioner's sister and thrown her to the ground.  Petitioner denied telling Owen that he aimed the car
27 at Myles.  Petitioner also testified the object that Myles threw at the car "splattered" on the
28 windshield and obscured Petitioner's vision.

*Case No. 1048160*

In 2002, Marta Velazquez worked as the manager of the men's clothing department at Clothes Avenue in Modesto. On October 10, 2002, Petitioner entered the store and asked Velazquez for help in purchasing some shoes. Velazquez was busy with a customer at the time so she asked a fellow employee to assist Petitioner.

Jacinto Perez, Velazquez's colleague, helped Petitioner purchase the shoes. Perez and Velazquez saw Petitioner pay for the shoes at the register but did not see him pay for anything else. At the time, Velazquez was standing about 20 feet from Petitioner.

Sometime later, the store security alarm went off and Velazquez and Perez saw Petitioner at the door, attempting to leave. Petitioner was holding two bags, one from Clothes Avenue and another bag that was his own. Velazquez asked to look in the other bag to determine what had set off the alarm. Petitioner refused and said the bags belonged to him.

Velazquez said the bag from Clothes Avenue appeared to contain the shoes Petitioner just purchased but she could not see the contents of the other bag. Velazquez insisted on looking into the second bag and stepped between Petitioner and the exit. Petitioner grabbed Velazquez by the shoulders and said he would not allow her to search him. He then gave her a little push.

When Petitioner pushed Velazquez harder a second time, she told employees to summon the police. Perez saw the encounter between Velazquez and Petitioner and described it as a "struggl[e]." Petitioner began to run and Perez chased him. As Petitioner ran away, he began dropping items from the bags. Perez chased Petitioner into a Rite-Aid Pharmacy, where he hid behind a counter. Perez knew that Rite-Aid had a police officer on the premises and he called on an employee to notify the officer. A short time later, another Clothes Avenue employee gave Velazquez a pair of pants apparently recovered from Petitioner. Petitioner did not have a receipt for the pants, which had a purchase price of approximately $50.

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

## II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme*,* 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo*,* 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petitioner's Claims**

     **A.  Grounds One and Five**

In grounds one and five of the petition, Petitioner argues that there was insufficient evidence to support the finding he had suffered a prior serious felony conviction. Petitioner claims that a conviction for assault under California Penal Code section 245(a)(1) is not automatically a serious felony conviction and that the prosecution failed to produce evidence showing that his prior assault conviction was a serious felony.

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. (Lodged Docs. 1-2.) The issue was then raised in a petition for review to the California Supreme Court, which summarily denied review. (Lodged Docs. 3-4.) The issue was also raised in a petition for writ of habeas corpus to the California Supreme Court, which summarily denied the petition. (Lodged Docs. 5-6.) The California Supreme Court, by its "silent orders" denying the petitions, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that there was sufficient evidence to find Petitioner's prior assault conviction was a serious felony, as it involved the use of scissors which qualify as a deadly weapon. (Lodged Doc. 2 at 27-31.)

A federal habeas court reviews sufficiency of evidence claims by determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Lewis v. Jeffers, 497 U.S. 764, 781 (1990); Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16.

Penal Code section 245(a)(1) prohibits "commit[ting] an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury." Cal. Penal Code § 245(a)(1). A conviction for assault with a deadly weapon constitutes a serious felony conviction, while a conviction for assault with force likely to cause great bodily injury, but without actually causing great bodily injury or using a deadly weapon, does not.

People v. Rodriguez, 17 Cal.4th 253, 261 (1998); People v. Banuelos, 130 Cal.App.4th 601, 605 (2005) ("[A] conviction of assault by means likely to cause great bodily injury is not a serious felony unless it also involves the use of a deadly weapon or actually results in the personal infliction of great bodily injury.").

The state court's determination was not unreasonable. The criminal complaint, amended criminal complaint, and information charging the prior assault alleged that Petitioner "commit[ted] an assault with a deadly weapon, to wit, scissors, upon Sim Seng, a human being." (CT at 165, 173, 180.) The abstract of judgment shows that Petitioner was convicted of the assault charge. (CT at 159.) Further, Petitioner acknowledged during his testimony that he had been convicted of the assault and that it had involved the use of scissors as a deadly weapon. (RT at 156.) In finding that the prior conviction constituted a serious felony, the trial court noted that Petitioner had been convicted of the charge of "assault with a deadly weapon upon a person with the use of scissors." (RT at 283-84.) The evidence was sufficient to find the prior assault conviction involved the use of a deadly weapon and therefore qualified as a serious felony conviction. See CALJIC 9.02 ("A 'deadly weapon' is any object, instrument, or weapon which is used in such a manner as to be capable of producing, and likely to produce, death or great bodily injury.").

**B. Ground Two**

Petitioner argues that the trial court erred in denying his motion to suppress his statements to detectives because they were made under the influence of drugs and were therefore involuntary.

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment in a reasoned opinion. (Lodged Docs. 1-2.) The issue was then raised in a petition for review to the California Supreme Court, which summarily denied review. (Lodged Docs. 3-4.) The California Supreme Court, by its "silent order" denying review, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that Petitioner's voluntary intoxication was not sufficient to make his statements involuntary, as there was no evidence that he was coerced or that he did not understand his *Miranda* rights or the questions being posed to him.

(Lodged Doc. 2 at 14-15.)

"A confession is voluntary if it is the product of a rational intellect and a free will ... whether [or not] a confession is the product of physical intimidation or psychological pressure [or] a drug-[alcohol-] induced statement." Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quotation marks omitted). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Beaty v. Schriro, 509 F.3d 994, 999 (9th Cir. 2007).

Here, Detective Owen, who conducted the interview with Petitioner, was questioned about the circumstances surrounding the interview. He stated that Petitioner was read his *Miranda* rights from a card and that Petitioner agreed to speak with the detectives. (RT at 185-87.) He testified there was nothing unusual about Petitioner's mental state and his speech was not slurred, although he did seem to be under the effect of a stimulant. (RT at 191-93.) Detective Owen based his conclusion on the fact that Petitioner's speech and pulse were rapid, his skin was hot, and he moved around a lot. (RT at 192-93.) Detective Owen explained, however, that Petitioner seemed focused and that he was able to respond to questions and maintain a conversation. (Id.)

Petitioner has not shown any coercion by the detectives in obtaining his statement. He has also not shown that he was unable to understand the questions asked to him or that he was unaware he was relinquishing his rights by speaking with the detectives. The state court's determination was therefore not unreasonable, as Petitioner has not shown that the circumstances caused his will to be overborne such that his statements were not the product of a rational intellect and a free will.

**C.  Ground Three**

Petitioner argues that his trial counsel provided ineffective assistance.

This claim was presented in a petition for writ of habeas corpus to the California Supreme Court. The court summarily denied the petition. (Lodged Docs. 5-6.) When the state court reaches a decision on the merits but provides no reasoning to support its conclusion, we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). However, although we

U.S. District Court
E. D. California

Jp

13

independently review the record, we still defer to the state court's ultimate decision. Id.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive the defendant of a fair trial, one whose result is reliable. Id. at 688. The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S. 648, 659 & n.25 (1984). Ineffective assistance of counsel claims

are analyzed under the "unreasonable application" prong of *Williams v. Taylor*, 529 U.S. 362 (2000). <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

Petitioner claims that his counsel was ineffective in not 1) conducting an independent investigation; 2) securing favorable witnesses; 3) marshaling the evidence; and 4) hiring an accident reconstructionist. He has not shown deficient performance or prejudice, however, as he has not demonstrated that favorable evidence could have been discovered and presented or that it would have affected the verdict.

Petitioner also argues that counsel should have 1) challenged the sufficiency of the evidence relating to his prior assault conviction; 2) moved to set aside the mayhem charge for lack of probable cause; 3) objected to the prosecution's argument that Petitioner was planning a robbery with the victim; 4) challenged the use of the medical report; and 5) objected to errors in the probation report and presented mitigating factors before sentencing. As discussed above, there was sufficient evidence to support the finding that Petitioner suffered a prior serious felony conviction for assault with a deadly weapon. Petitioner did not suffer prejudice from counsel's failure to move to set aside the mayhem charge as Petitioner was not convicted of mayhem. Petitioner has not established prejudice resulting from counsel's failure to object to the prosecution's argument regarding the planned robbery. Finally, Petitioner has not established deficient performance or prejudice relating to the medical report or probation report, as he has not specifically identified what counsel should have done or shown a reasonable probability of a different result if counsel had done so. Petitioner has also not specifically identified any mitigating factors that could have been presented prior to sentencing that were likely to affect his sentence.

### D.  Ground Four

Petitioner argues that there was insufficient evidence to support his conviction for assault with a deadly weapon, as the evidence shows that the incident was an accident.

This claim was presented in a petition for writ of habeas corpus to the California Supreme Court. The court summarily denied the petition. (Lodged Docs. 5-6.) When the state court reaches a decision on the merits but provides no reasoning to support its conclusion, we independently

1  review the record to determine whether the state court clearly erred in its application of Supreme
2  Court law.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  However, although we
3  independently review the record, we still defer to the state court's ultimate decision.  Id.

4        As stated above, a federal habeas court reviews sufficiency of evidence claims by
5  determining "whether, after viewing the evidence in the light most favorable to the prosecution, any
6  rational trier of fact could have found the essential elements of the crime beyond a reasonable
7  doubt."  Lewis v. Jeffers, 497 U.S. 764, 781 (1990); Jackson v. Virginia, 443 U.S. 307, 318-19
8  (1979).  "[T]he standard must be applied with explicit reference to the substantive elements of the
9  criminal offense as defined by state law."  Jackson, 443 U.S. at 324 n.16.

10
11        Penal Code section 245(a)(1) prohibits "commit[ting] an assault upon the person of another
12  with a deadly weapon or instrument other than a firearm or by any means of force likely to produce
13  great bodily injury."  Cal. Penal Code § 245(a)(1).

14        Here, the victim testified that he and Petitioner had agreed to give a ride to two individuals in
15  exchange for money.  (RT at 8-10.)  However, after the victim mentioned that the money would be
16  used to buy drugs, the two individuals refused to be involved in the exchange.  (RT at 8-10.)  The
17  victim testified that Petitioner became angry with him and told him to get out of the vehicle, which
18  he did.  Petitioner then revved the engine, circled the gas pumps, drove the vehicle into the victim,
19  and left the scene.  (RT at 12-15.)  Another witness testified that Petitioner drove his vehicle around
20  the gas island closest to the store, then headed straight toward the victim who was standing by a
21  garbage can at the end of the gas island.  (RT at 230.)  The same witness testified that it did not look
22  like Petitioner ever lost control of the vehicle before it went onto the curb by the gas pumps and
23  struck the victim.  (RT at 232.)  There was also other testimony corroborating the victim's claim that,
24  after the vehicle struck him, Petitioner drove away from the scene.  (RT at 95, 233.)

25        Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact
26  could have found that Petitioner violated Penal Code section 245(a)(1) when he struck the victim
27  with his vehicle.
28

### E. Ground Six

Petitioner argues that his appellate counsel was ineffective in not raising the claims presented in this petition.

This claim was presented in a petition for writ of habeas corpus to the California Supreme Court. The court summarily denied the petition. (Lodged Docs. 5-6.) When the state court reaches a decision on the merits but provides no reasoning to support its conclusion, we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). However, although we independently review the record, we still defer to the state court's ultimate decision. Id.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the two-prong test set forth in *Strickland*. See, e.g., Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir. 1986). A defendant must therefore show that appellate counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, defendant would have prevailed on appeal. Miller, 882 F.2d at 1434 & n.9; Birtle, 792 F.2d at 849. However, appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by a defendant. Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Miller, 882 F.2d at 1434 n.10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. Miller, 882 F.2d at 1434. As a result, appellate counsel will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason--because he declined to raise a weak issue. Id.

Petitioner has not shown that counsel was deficient in failing to raise grounds one, two, and five on appeal, as those issues were presented in the appeal to the California Court of Appeal and in the petition for review to the California Supreme Court. (Lodged Docs. 1-4.) Petitioner has also not shown prejudice resulting from the failure to raise his claims on appeal, as the claims each lack merit for the reasons discussed above.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:      November 21, 2008            /s/ John M. Dixon**
                                  UNITED STATES MAGISTRATE JUDGE